

SO ORDERED,

**Judge Neil P. Olack**
**United States Bankruptcy Judge**
**Date Signed: December 12, 2017**

**The Order of the Court is set forth below. The docket reflects the date entered.**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

    CHUCK WILLIS,                                    **CASE NO. 17-00160-NPO**

    DEBTOR.                                          **CHAPTER 7**

CHUCK WILLIS                                          **PLAINTIFF**

VS.                                           **ADV. PROC. NO. 17-00025-NPO**

TOWER LOAN OF MISSISSIPPI, LLC, d/b/a
TOWER LOAN OF CRYSTAL SPRINGS                     **DEFENDANT**

### MEMORANDUM OPINION AND ORDER ON DEFENDANT
### TOWER LOAN'S MOTION TO DISMISS OR, ALTERNATIVELY, TO COMPEL
### ARBITRATION AND TO DISMISS OR STAY CLAIMS PENDING ARBITRATION

       This matter came before the Court for hearing on October 25, 2017 (the "Hearing"), on the Defendant Tower Loan's Motion to Dismiss or, Alternatively, to Compel Arbitration and to Dismiss or Stay Claims Pending Arbitration (the "Motion to Dismiss or to Compel Arbitration") (Adv. Dkt. 8)[1] filed by Tower Loan of Mississippi, LLC ("Tower Loan"), the Defendant Tower Loan's Memorandum in Support of Motion to Dismiss or, Alternatively, to Compel Arbitration and to Dismiss or to Stay Pending Arbitration ("Tower Loan's Brief") (Adv. Dkt. 9) filed by

---

[1] Citations to the record are as follows: (1) citations to docket entries in the above-styled adversary proceeding (the "Adversary") are cited as "(Adv. Dkt. __)"; and (2) citations to docket entries in the above-styled bankruptcy case (the "Bankruptcy Case") are cited as "(Bankr. Dkt. __)".

Tower Loan, the Plaintiff's Response to Defendant's Motion to Dismiss and to Compel Arbitration (the "Debtor's Response") (Adv. Dkt. 17) filed by the debtor, Chuck Willis (the "Debtor"), the Memorandum Brief in Support of Plaintiff's Response to Defendant's Motion to Dismiss and to Compel Arbitration (the "Debtor's Brief") (Adv. Dkt. 18) filed by the Debtor, and the Defendant Tower Loan's Reply in Support of its Motion to Compel Arbitration and to Dismiss or to Stay Pending Arbitration ("Tower Loan's Reply") (Adv. Dkt. 21) filed by Tower Loan in the Adversary.  At the Hearing, Bryce Kunz represented the Debtor, and Jeffrey Ryan Barber represented Tower Loan.  During the Hearing, the Debtor and Tower Loan (collectively, the "Parties") introduced into evidence two (2) stipulated exhibits.  The issues in the Adversary are: (1) whether the Parties formed an agreement to arbitrate and (2) whether the arbitration agreement actually contains a delegation clause requiring the Parties' claims to proceed to arbitration.  The Court, having considered the pleadings, evidence, and arguments of counsel, finds that the Parties did not agree to arbitrate for the reasons set forth below.[2]

### Jurisdiction

This Court has jurisdiction over the parties to and the subject matter of this Adversary pursuant to 28 U.S.C. § 1334.  Notice of the Motion to Dismiss or to Compel Arbitration was proper under the circumstances.

### Facts

1.  On November 8, 2016, the Debtor entered into the Installment Loan Agreement and Disclosure Statement (the "Loan Agreement") with Tower Loan (Ex. 1).  The Debtor financed $4,481.98 with a 37.36% annual rate of interest to be paid in twenty-six (26) equal

---

[2] Pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable to the Adversary by Rule 7052 of the Federal Rules of Bankruptcy Procedure, the following constitutes the findings of fact and conclusions of law of the Court.

installments of $254.00 for a total payment to Tower Loan of $6,604.00.  (*Id.*)  Additionally, the Debtor obtained from Tower Loan credit life insurance at $228.94 per annum, credit disability insurance at $303.78 per annum, and credit property insurance at $429.26 per annum.  (*Id.*)

2.      The Loan Agreement consists of one (1) page and does not contain a merger clause.[3]  The Debtor's signature appears at the bottom of the document, and the following language, in all capital letters, appears directly above the Debtor's signature: "Arbitration Agreement: By signing below and obtaining this [l]oan, [b]orrower agrees to the Arbitration Agreement on the additional pages of this [a]greement. You should read it carefully before you sign below. Important provisions, including our privacy policy, are contained on additional pages and incorporated herein." (the "Arbitration Disclaimer") (Ex. 1).

3.      The reverse side of the Loan Agreement contains the Arbitration Agreement (the "First Arbitration Agreement") (Ex. 1).  The First Arbitration Agreement "applies to all claims and disputes between [b]orrower and [l]ender," including "[t]he loan [b]orrower is obtaining from [l]ender today and any other loans or retail installment contracts with [l]ender" and "[a]ny insurance purchased in connection with this loan or any previous loan or retail installment sales contract."  (Ex. 1).

4.      The Loan Agreement provides that "[t]he construction, validity, and enforcement of this loan agreement shall be governed by the laws of the State of Mississippi, without regard to the principles of conflicts of laws."  (Ex. 1).

---

[3] A merger clause "signal[s] to the courts that the parties agree that the contract is to be considered completely integrated." *Grand Legacy, LLP v. Gant*, 66 So. 3d 137, 145 (Miss. 2011).  A standard merger clause "achieves the purpose of ensuring that the contract at issue invalidates or supersedes any previous agreements, as well as negat[es] the apparent authority of an agent to later modify the contract's terms." *LHC Nashua P'ship, Ltd. v. PDNED Sagamore Nashua, L.L.C.*, 659 F.3d 450, 460 (5th Cir. 2011) (quoting *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W. 3d 323, 334 (Tex. 2011)).

5.      In Tower Loan's Brief, Tower Loan asserts that the First Arbitration Agreement contains a delegation clause.

6.      On January 17, 2017, the Debtor filed a petition for relief under chapter 7 of the U.S. Bankruptcy Code (Bankr. Dkt. 1).

7.      On May 12, 2017, the Debtor filed the Complaint in this Adversary alleging that Tower Loan violated the Truth in Lending Act, 15 U.S.C. § 1600 *et seq.*, and Regulation 2 by providing misleading and incorrect disclosures on the Loan Agreement (Adv. Dkt. 1 at 4-5). For example, the Debtor alleges that Tower Loan did not pay to the appropriate insurance company the amounts required for the Debtor's life insurance, disability insurance, and property insurance (Adv. Dkt. 1 at 3, ¶ 15). The Debtor further asserts that Tower Loan "received an undisclosed commission from these charges." (*Id.*)

8.      On June 22, 2017, Tower Loan filed the Answer and Affirmative Defenses to Complaint [Adv. Proc. Dkt. #3] [*sic*] (Adv. Dkt. 6). Tower Loan filed the Amended Answer and Affirmative Defenses to Complaint [Adv. Proc. Dkt. #3] [*sic*] (the "Amended Answer") on October 30, 2017, denying that it violated the Truth in Lending Act (Adv. Dkt. 22).[4]

9.      On July 6, 2017, Tower Loan filed the Motion to Dismiss or to Compel Arbitration. In support of dismissal, Tower Loan asserted that the chapter 7 trustee (the

---

[4] The first paragraph of the Amended Answer states: "Further, in accordance with Federal Rules of Bankruptcy Procedure 7012(b) and 9015(a), Miss. Bank. L.R. 7012-1 and 9015-1, and Federal Rule of Civil Procedure 38, *Country Credit, LLC* demands a jury trial on all of the claim [*sic*] raised in the Adversary Proceeding Complaint, and *Country Credit, LLC* does not consent to having a jury trial conducted by a Bankruptcy Judge under 28 U.S.C. § 157(e) or to the entry of final orders or judgment by the Bankruptcy Court." (Adv. Dkt. 22 at 1) (emphasis added). In light of the pleadings and arguments made by counsel at the Hearing, the Court notes that this language in the Amended Answer is clearly the result of a typographical error on behalf of Tower Loan. Country Credit, LLC is not a party to the Adversary, and Tower Loan has requested the Court to compel arbitration in lieu of litigation.

"Trustee") is the only party with standing to pursue the Debtor's claims against Tower Loan because those claims became property of the estate upon commencement of the Bankruptcy Case (Adv. Dkt. 9). In support of compelling arbitration, Tower Loan asserted that the Debtor signed the Loan Agreement containing the Arbitration Disclaimer. (*Id.*)

10.     On September 26, 2017, the Trustee filed the Notice of Ratification of Real Party in Interest (Adv. Dkt. 16).

11.     On September 26, 2017, the Debtor filed the Debtor's Response. In support of denying dismissal, the Debtor asserted that the Trustee, as the real party in interest, ratified the Adversary. In support of litigation, the Debtor asserted that it was unclear whether he actually agreed to the arbitration agreement and that procedural unconscionability precluded enforcing the First Arbitration Agreement. The Debtor attached the Affidavit of Chuck Wills to the Debtor's Response.

12.     On October 10, 2017, Tower Loan filed Tower Loan's Reply withdrawing its contention that the Debtor lacked standing. Tower Loan further asserted that the Parties formed a valid agreement to arbitrate and that the First Arbitration Agreement is not unconscionable. Additionally, Tower Loan argued that unconscionability is an issue for the arbitrator to decide since the First Arbitration Agreement contains a delegation clause.

13.     At the Hearing, the Parties presented to the Court, for the first time, the Endorsement to Require Binding Arbitration (the "Second Arbitration Agreement") (together with the First Arbitration Agreement, the "Arbitration Agreements") (Ex. 2). The Second Arbitration Agreement "applies to all claims and disputes between [b]orrower and the [c]ompany," including "the loan [b]orrower is obtaining from the lender today, any other loans or retail installment contracts with the [l]ender," and "any insurance purchased from the

[c]ompany in connection with the loan or any previous loan or retail installment sales contract."

(Ex. 2).  Tower Loan explained that the Second Arbitration Agreement makes up the "additional

pages" referenced in the Loan Agreement's Arbitration Disclaimer.[5]

14.     The Arbitration Agreements contain conflicting arbitration provisions.   The

conflicts involve: (1) the number of arbitrators,[6] (2) how the arbitrator(s) will be selected,[7] (3)

the notice required to arbitrate,[8] (4) the location of the arbitration,[9] (5) who pays the costs of the

---

[5]  10:10:32 – 10:10:52.   The Hearing was not transcribed.   References to argument presented at the Hearing is cited by the timestamp of the audio recording.

[6] The First Arbitration Agreement provides that "[t]he dispute shall be heard by a single arbitrator," but the Second Arbitration Agreement permits a party to request a panel of three arbitrators.

[7] The First Arbitration Agreement provides that "[i]f an answering statement is filed and the parties cannot agree upon the arbitrator, then the provisions of the Federal Arbitration Act (9 U.S.C. §5), shall apply," but the Second Arbitration Agreement provides that "[i]f an answering statement is filed and the parties cannot agree upon the arbitrator, the National Arbitration Forum shall appoint the arbitrator."

[8]  The First Arbitration Agreement requires a thirty (30)-day notice period before proceeding to arbitration, whereas the Second Arbitration Agreement requires only twenty (20) days.   Additionally, under the Arbitration Agreements, if a party files an answering statement after the expiration of the notice period, the opposing party selects the arbitrator.

[9] The First Arbitration Agreement provides that "[t]he arbitration shall be held in Rankin County, Mississippi, unless the [b]orrower requests in the demand for arbitration or the answering statement, the arbitration to be held in his, her, or its county of residence or principal place of business," but the Second Arbitration Agreement provides automatically for the arbitration to be held in the borrower's county of residence.

arbitration,[10] (6) who would be entitled to attorneys' fees and on what showing,[11] and (7) when arbitration proceedings need not be initiated.[12] (Ex. 1; Ex. 2).

15.     At the Hearing, the Debtor argued that because the Arbitration Agreements govern "all claims and disputes between the Parties" but contain different and conflicting terms, there was no meeting of the minds between the Parties with respect to arbitration.[13]   In response, Tower Loan asserted that the Parties reached a meeting of the minds with respect to arbitration.[14]   More specifically, Tower Loan argued that the First Arbitration Agreement governs the Loan Agreement, and the Second Arbitration Agreement relates only to disputes concerning insurance companies and policies.[15]   With respect to the Adversary, Tower Loan

---

[10] The First Arbitration Agreement provides that the "[l]ender shall pay the arbitrator's fees and expenses for the first two days of hearings." Further, the First Arbitration Agreement provides that "[i]n his decision or award, the arbitrator shall direct the parties to pay his or her fees and other costs according to the relative fault of the parties." Additionally, the Second Arbitration Agreement provides that "the [c]ompany shall pay all costs of the arbitration," excluding attorneys, experts, and witness fees and expenses.

[11] The First Arbitration Agreement does not address which party is responsible for paying attorneys, experts, and witness fees and expenses.  The Second Arbitration Agreement, however, provides that "each party must bear the cost of its own attorneys, experts and witness fees and expenses," unless the arbitrator chooses to award otherwise.

[12] Under the First Arbitration Agreement, the "[l]ender is not required to initiate arbitration proceedings for collection matters of $10,000 or less or before repossessing collateral or foreclosing upon real property. However, disputes arising out of or relating to foreclosure or repossession of collateral shall be arbitrated." The Second Arbitration Agreement, however, contains no such carve out.

[13] 10:22:40 – 10:22:57.

[14] 10:30:45 – 10:30:54.

[15] 10:30:58 – 10:31:17.

asserted that it would proceed only under the First Arbitration Agreement because the Complaint does not raise any insurance-related claims.[16]

## Discussion

The Supreme Court of the United States has long acknowledged "a national policy favoring arbitration when the parties contract for that mode of dispute resolution." *Preston v. Ferrer*, 552 U.S. 346, 349 (2008). Indeed, the Federal Arbitration Act (FAA) provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. 9 U.S.C. § 2. With this policy in mind, however, "courts must place arbitration agreements on an equal footing with other contracts . . . and enforce them according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011); *see Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006); *Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989).

Thus, the enforcement of an arbitration agreement is a matter of both contract formation and contract interpretation. *Kubala v. Supreme Prod. Srvs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016). The Fifth Circuit Court of Appeals has established a two-prong test for courts to follow when ruling on a motion to compel arbitration: (1) "whether the parties entered into *any arbitration agreement at all*" and (2) "whether *this* claim is covered by the arbitration agreement." *Id.* When an "arbitration agreement contains a delegation clause giving the arbitrator the primary power to rule on the arbitrability of a specific claim . . . the court's power to decide arbitrability questions [transfers] to the arbitrator." *Id.* at 201-02. In other words, "a

---

[16] 10:31:18 – 10:31:29.

valid delegation clause requires the court to refer a claim to arbitration to allow the arbitrator to decide gateway arbitrability issues." *Id.* at 202; *see Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010). When a "party seeking arbitration points to a purported delegation clause," the court limits its analysis to that of contract formation and answers only the question of whether the parties entered into an agreement to arbitrate some set of claims. *Kubala*, 830 F.3d at 202. If the court finds both a valid agreement to arbitrate and a delegation clause within that agreement, "the motion to compel arbitration should be granted in almost all cases." *Id.*

Here, Tower Loan contends that the First Arbitration Agreement contains a valid and enforceable delegation clause (Adv. Dkt. 9). As a result, the Court will address two issues: first, whether the Parties entered into a valid agreement to arbitrate a set of claims; and second, whether that agreement contains a delegation clause requiring the Parties' claims to proceed to arbitration "for gateway rulings on threshold arbitrability issues." *Id.*

## A.    Did the Parties enter into a valid agreement to arbitrate a set of claims?

The "federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073-74 (5th Cir. 2002); *see also Volt Info. Scis., Inc.*, 489 U.S. at 478 ("[T]he FAA does not require parties to arbitrate when they have not agreed to do so."). Instead, state contract law determines whether parties entered into a valid agreement to arbitrate a set of claims. *Kubala*, 830 F.3d at 202. Since the Loan Agreement provides that Mississippi law governs "[t]he construction, validity and enforcement of th[e] loan agreement" and the Parties directed the Court to Mississippi law in their pleadings and at the Hearing, the Court will apply Mississippi law to determine whether the Parties entered into a valid agreement to arbitrate their claims.

Under Mississippi law, "[a] contract is unenforceable if the material terms are not sufficiently definite." *Rotenberry v. Hooker*, 864 So. 2d 266, 270 (Miss. 2003). A contract is sufficiently definite when it contains enough information to "enable the court under proper rules of construction to ascertain its terms." *Hunt v. Coker*, 741 So. 2d 1011, 1014 (Miss. 1999) (quoting *Leach v. Tingle*, 586 So. 2d 799, 802 (Miss. 1991)). Additionally, a meeting of the minds is essential for an agreement to be valid and binding upon the parties. *Davis v. Davis (Estate of Davis)*, 832 So. 2d 534, 537 (Miss. App. Ct. 2001); *see Union Planters Bank, Nat'l. Ass'n v. Rogers*, 912 So. 2d 116, 120 (Miss. 2005) ("A cardinal rule of construction of a contract is to ascertain the mutual intentions of the parties."). While no Mississippi court[17] has addressed whether parties can be compelled to arbitrate under conflicting arbitration agreements, other courts have found that conflicting arbitration agreements eliminate the duty to arbitrate.[18]

### 1.     The Tenth Circuit Court of Appeals' Decision

In *Ragab v. Howard*, 841 F.3d 1134 (10th Cir. 2016), the Tenth Circuit Court of Appeals held that "conflicting details in the multiple arbitration provisions indicate that there was no meeting of the minds with respect to arbitration." *Id.* at 1138. In *Ragab*, the parties entered into a business relationship evidenced by six agreements containing conflicting arbitration provisions.

---

[17] In the Motion to Dismiss or to Compel Arbitration, Tower Loan references this Court's Memorandum Opinion and Order Granting Motion of the Bilco Company for Relief from the Automatic Stay to Complete Arbitration, *In re Katon, Inc.*, No. 08-02266-NPO (Dkt. 73) (Bankr. S.D. Miss. Nov. 13, 2008). *In re Katon, Inc.* is not factually analogous to the Adversary because it does not involve conflicting arbitration agreements, but rather a single arbitration agreement executed by the parties after the execution of the underlying agreements in which the parties agreed to arbitrate the non-core proceeding filed in state court. Accordingly, the Court does not find *In re Katon, Inc.* persuasive in the Adversary.

[18] See, e.g., In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, and Prods. Liab. Litig., 838 F. Supp. 2d 967, 992 (C.D. Cal. 2012); Basulto v. Hialeah Auto., 141 So. 3d 1145, 1156 (Fla. 2014).

*Id.* at 1136.  The conflicts involved the following: "(1) which rules will govern,[19] (2) how the arbitrator will be selected,[20] (3) the notice required to arbitrate,[21] and (4) who would be entitled to attorneys' fees and on what showing."[22]  *Id.*  A few years later, plaintiff sued the defendants for misrepresentation and violation of consumer credit repair statutes.  The district court found that all six agreements governed plaintiff's claims.  The defendants moved to compel arbitration, and the district court denied the motion, "concluding that there was no actual agreement to arbitrate as there was no meeting of the minds as to how claims that implicated the numerous agreements would be arbitrated."  *Id.*  The defendants appealed.

Upon review, the Tenth Circuit applied Colorado law to determine whether the parties agreed to arbitrate.  *Id.* at 1137.  The applicable state law required the parties to achieve a meeting of the minds with respect to the agreement and agree on all essential terms.  *Id.*  The Tenth Circuit looked to the New Jersey court's decision in *NAACP of Camden County East v. Foulke Management Corporation*, 24 A.3d 777 (N.J. Super. Ct. App. Div. 2011), for guidance on whether the parties achieved a meeting of the minds on the decision to arbitrate their claims.[23]

----

[19] One agreement provided that Colorado's Uniform Arbitration Act of 1975 would govern, three agreements provided that the AAA Commercial Arbitration Rules would govern, and one agreement provided that the "Rules of the Colorado Court" would govern the arbitration. *Ragab*, 841 F.3d at 1136 n.1.

[20] One agreement provided that the parties would choose the arbitrator.  If the parties could not agree upon an arbitrator, a state court would appoint one.  Three agreements provided that the American Arbitration Association (AAA) would choose the arbitrator.  *Id.*

[21] One agreement required a thirty (30)-day notice period, and two agreements required only a ten (10)-day notice period before beginning arbitration.  *Id.*

[22] One agreement required each party to pay its own costs and fees, but three agreements allowed for the arbitrator to award costs and fees to the prevailing party.  *Id.*

[23] The Tenth Circuit considered *NAACP* because there were no factually analogous cases in Colorado.

In *NAACP*, the parties presented the court with three agreements that each contained an arbitration provision. *NAACP of Camden Cty. E.*, 24 A.3d at 781-82. Similar to the arbitration agreements in *Ragab*, these arbitration provisions contained several inconsistencies. *Id.* at 794. For example, "the documents d[id] not clearly and consistently express the nature and locale of the arbitration forum itself." *Id.* The first agreement provided that the venue of the arbitration would lie in the federal district in which the purchaser resided, the second agreement more narrowly provided that venue would lie in the customer's county of residence, and the third agreement more broadly provided that venue would lie in New Jersey, unless otherwise agreed upon by the parties. *Id.* Further, "[t]he form documents . . . d[id] not make clear the time limit in which arbitration must be initiated." *Id.* The first agreement did not contain a time limitation, the second agreement indicated that all applicable statutes of limitation applied, and the third agreement required the purchaser to bring all claims within 180 days from the date of the agreement, while also providing that it would not affect applicable statutes of limitation. *Id.* at 794-95. "Equally murky," the agreements contained various provisions describing the arbitration costs. *Id.* at 795-96. The cost provisions in one agreement were "in some respects potentially less favorable to the purchaser, . . . in some respects potentially more favorable, and in some respects unclear." *Id.* at 795.

Based on these conflicts, the New Jersey court found that "the arbitration provisions . . . [were] too plagued with confusing terms and inconsistencies to put a reasonable consumer on fair notice of their intended meaning." *Id.* at 794. Thus, the New Jersey court held that the conflicting arbitration provisions were "unenforceable for lack of mutual assent." *Id.* at 798. Because of *NAACP*'s factual similarities to *Ragab* and the Supreme Court of the United States' finding in *AT&T Mobility LLC* that "the FAA does not require an arbitration provision to be

enforced if the provision is defective for reasons other than public policy or unconscionability," the Tenth Circuit adopted the reasoning of the court in *NAACP* and affirmed the district court's decision, holding that the parties did not achieve a meeting of the minds with respect to arbitration.[24]  *Ragab*, 841 F.3d at 1138; *see AT&T Mobility LLC*, 563 U.S. at 344.

Associate Justice Neil Gorsuch, former Circuit Judge for the Tenth Circuit Court of Appeals, dissented in *Ragab*, arguing that the parties formed a valid agreement to arbitrate their claims.  *Ragab*, 841 F.3d at 1139 (Gorsuch, J., dissenting).  As a preliminary matter, Justice Gorsuch noted that *Ragab* involved sophisticated parties to a commercial deal.  In fact, plaintiff's counsel drafted three of the agreements containing arbitration clauses.  *Id.*  While acknowledging that the agreements differed on "the details concerning *how* arbitration should proceed," Justice Gorsuch argued that "treating the procedural details surrounding the arbitration . . . as *non*essential terms would do a good deal more to 'effectuate[] the intent of the parties' . . . itself always the goal of contract interpretation."  *Id.* (citing *Lane v. Urgitus*, 145 P.3d 672, 677 (Colo. 2006)).  To do this, Justice Gorsuch proposed two courses of action.  First, the plaintiff could initiate arbitration under the agreement of his choosing because "the defendants have expressly acknowledged that his claims f[ell] within the scope of every single agreement."  *Ragab*, 841 F.3d at 1139 (Gorsuch, J. dissenting).  Second, the state's preference for arbitration has caused it to enforce arbitration clauses stating only that claims "shall be submitted to binding arbitration"

---

[24] The Tenth Circuit noted that "[c]ourts have granted motions to compel despite the existence of conflicting arbitration provisions when the contracts themselves provide the solution." *Ragab*, 841 F.3d at 1138; *see Ex parte Palm Harbor Homes, Inc.*, 798 So. 2d 656, 660 (Ala. 2001) (compelling arbitration when a contract includes an arbitration provision and a merger clause because the merger clause enables the arbitration provision to supersede other, conflicting provisions).  None of the agreements in *Ragab*, however, contained merger clauses. *Ragab*, 841 F.3d at 1138.

with no mention of procedural details. *Id.* The procedural details can later be established by the FAA or state statutory law. *Id.* at 1139-40.

Next, Justice Gorsuch explained a "battle of the forms" analogy where "purchasers and vendors agree to transact but each side memorializes the deal on its own standard forms." *Id.* at 1140. When these forms contain conflicting terms, they "knock each other out but do not void the contract." *Id.* Under the Uniform Commercial Code, "a meeting of the minds occurs with respect to the fundamentals of the deal even if not with respect to the details." *Id.* Since the case involved sophisticated parties who mutually contributed to drafting the agreements, Justice Gorsuch argued that a "battle of the forms" approach would better serve the parties' intent to arbitrate their claims rather than "allowing the plaintiff to escape the consequences of a choice he once so clearly preferred but now simply regrets." *Id.*

To protect consumers, New Jersey courts stress a "need for clarity" in arbitration agreements and take "particular care" in assessing mutual asset because of a consumer's inferior bargaining power. *Id.*; *see NAACP of Camden Cty. E.*, 24 A.3d at 790-91, 97. Justice Gorsuch, however, did not find *NAACP* persuasive because *Ragab* "involve[d] parties to a commercial, not a consumer, transaction, with contracts actively negotiated by both sides, not contracts of adhesion thrust upon the plaintiff." *Ragab*, 841 F.3d at 1140. When a state has not adopted a public policy statute requiring clarity in a consumer contract, Justice Gorsuch argues that the court should further the national policy favoring arbitration and not create barriers to arbitration, particularly in a commercial setting where the parties are represented by counsel and "have so clearly and repeatedly demonstrated their desire to arbitrate." *Id.* Justice Gorsuch did not provide any citations to cases where courts compelled arbitration when an agreement contained materially inconsistent and conflicting arbitration provisions. With *NAACP*, *Ragab*, and Justice

Gorsuch's dissent in *Ragab* in mind, the Court now turns to the Adversary to determine precisely the same issue—whether the Parties formed a valid agreement to arbitrate their claims.

### 2.    The Adversary

In its opening remarks at the Hearing, Tower Loan argued that the First Arbitration Agreement contains a delegation clause and, therefore, the Court's analysis is limited to whether the Parties entered into a valid agreement to arbitrate their claims and whether the agreement actually contains a delegation clause requiring the claims to proceed to arbitration for gateway rulings.[25]   Tower Loan argued that the Parties undisputedly agreed to arbitrate their claims because the Debtor signed both the Loan Agreement containing the First Arbitration Agreement and the Second Arbitration Agreement.[26]   Additionally, Tower Loan explained that Mississippi law requires a borrower to read documents before applying his signature, and the Debtor cannot avoid arbitration simply because he did not know the terms of the Loan Agreement.[27]   In response, the Debtor contended that while he did sign both the Loan Agreement containing the First Arbitration Agreement and the Second Arbitration Agreement, the Arbitration Agreements contain inconsistent and conflicting terms.[28]   Because of the inconsistent and conflicting terms, the Debtor argued that the Parties did not achieve a meeting of the minds on the decision to arbitrate their claims.[29]   Tower Loan, however, claimed that the Parties reached a meeting of the

---

[25] 10:13:36 – 10:15:15; *see Kubala*, 830 F.3d at 202.

[26] 10:08:40 – 10:09:00.

[27] 10:13:10 – 10:13:24.

[28] 10:22:40 – 10:22:57.

[29] 10:22:58 – 10:28:02.

minds with respect to arbitration.[30]   In support its argument, Tower Loan contended that the Arbitration Agreements govern different issues and/or parties, and the Second Arbitration Agreement relates only to claims against insurance companies arising out of insurance policies.[31] To the extent that the Arbitration Agreements conflict, Tower Loan argued that the inconsistencies are irrelevant because, in the Adversary, Tower Loan is proceeding only under the First Arbitration Agreement.[32]   Because Tower Loan asserted that the Arbitration Agreements govern separate issues and/or parties, and the Debtor maintained that the Arbitration Agreements encompass all parties and claims but contain inconsistent and conflicting procedural provisions, the Court will first address whether the Arbitration Agreements govern separate issues and/or parties to determine if the inconsistent and conflicting provisions should impact the Court's analysis on whether the Parties achieved a meeting of the minds with respect to arbitration.

After reviewing the Loan Agreement and the Arbitration Agreements, the Court finds that the Arbitration Agreements govern claims against Tower Loan both arising under the Loan Agreement and out of insurance policies.  For example, the First Arbitration Agreement "applies to *all* claims and disputes between [b]orrower and [l]ender . . . includ[ing] . . . *all* claims and

---

[30] 10:30:45 – 10:30:54.

[31] 10:30:58 – 10:31:17.  In support of its argument that the Second Arbitration Agreement applies only to claims against insurance companies arising out of insurance policies, Tower Loan highlighted the following provisions: (1) the title of the agreement is "Endorsement to Require Binding Arbitration;" (2) the Second Arbitration Agreement defines "Company" as "the insurance company or companies as marked below;" (3) the last paragraph of the Second Arbitration Agreement provides that "[t]his endorsement applies to the policy or policies issued by the [c]ompany or [c]ompanies marked below;" and (4) American Federated Life Insurance Company and American Federated Insurance Company are the only companies listed, and both are marked with an "X."  (Ex. 2).

[32] 10:31:18 – 10:31:29.

disputes arising out of . . . [t]he loan [b]orrower is obtaining from [l]ender today and . . . [a]ny insurance purchased in connection with this loan." (Ex. 1, ¶ 1) (emphasis added). Additionally, the First Arbitration Agreement "applies to *all* disputes and claims between [b]orrower and [l]ender, [l]ender's agents, employees, affiliated corporations and the employees or agents of these affiliated companies." (*Id.* ¶ 2) (emphasis added). The lender is defined as *Tower Loan of Mississippi, LLC*, and the affiliated companies include, without limitation, "*American Federated Insurance Company*, *American Federated Life Insurance Company*, First Tower Loan LLC, Tower Loan of Mississippi LLC, Gulfco of Mississippi LLC, Gulfco of Alabama LLC, Gulfco of Louisiana LLC, Tower Loan of Missouri LLC, and First Tower LLC." (*Id.*) (emphasis added). Further, the Second Arbitration Agreement "applies to *all* claims and disputes between [b]orrower and the [c]ompany . . . includ[ing] . . . *all* claims and disputes arising out of . . . the loan [b]orrower is obtaining from the lender today [and] . . . any insurance purchased from the [c]ompany in connection with the loan." (Ex. 2, ¶ 1) (emphasis added). The Second Arbitration Agreement also "applies to *all* disputes and claims between [b]orrower and the [c]ompany, the [c]ompany's agents, employees, affiliated corporations and the employees or agents of these affiliated companies." (*Id.* ¶ 2) (emphasis added). The company is defined as both *American Federated Life Insurance Company* and *American Federated Insurance Company*, and the affiliated companies include, without limitation, "First Tower Loan, LLC, FT Finance Holding LLC, *Tower Loan of Mississippi, LLC*, and Gulfco of Mississippi, LLC." (*Id.*) (emphasis added). After drafting the Arbitration Agreements as broadly as possible, Tower Loan cannot now "arbitrarily pick one to enforce [in the Adversary] because doing so could violate the other." *Ragab*, 841 F.3d at 1138. The Court finds that the Arbitration Agreements' inconsistent and

conflicting provisions, therefore, are relevant to its determination of whether the Parties achieved a meeting of the minds with respect to arbitration.[33]

Similar to the courts in *Ragab* and *NAACP*, the Court finds that the Arbitration Agreements contain several material conflicts and inconsistencies. The conflicts and inconsistencies concern the following: (1) the number of arbitrators, (2) how the arbitrator(s) will be selected, (3) the notice required to arbitrate, (4) the location of the arbitration, (5) who pays the costs of the arbitration, (6) who would be entitled to attorneys' fees and on what showing, and (7) when arbitration proceedings need not be initiated. The Court will address each in turn.

First, the First Arbitration Agreement provides that "[t]he dispute shall be heard by a single arbitrator." (Ex. 1, ¶ 4). The Second Arbitration Agreement, however, permits a party to request "a panel of three arbitrators instead of a single arbitrator." (Ex. 2, ¶ 4). Thus, the Arbitration Agreements are inconsistent.

Second, and similar to *Ragab*, the First Arbitration Agreement provides that "[i]f an answering statement is filed and the parties cannot agree upon the arbitrator, then the provisions of the Federal Arbitration Act (9 U.S.C. §5), shall apply." (Ex. 1, ¶ 4). Under this provision, "the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein." 9 U.S.C. § 5. In the Second Arbitration Agreement, however, "[i]f an answering statement is filed and the parties cannot agree upon [the] arbitrator,

---

[33] Since the Loan Agreement does not contain a merger clause, the Court is unable to discern whether one arbitration agreement could potentially supersede the other arbitration agreement. *See Ex parte Palm Harbor Homes, Inc.*, 798 So. 2d at 660 (compelling arbitration when a contract includes an arbitration provision and a merger clause because the merger clause enables the arbitration provision to supersede other, conflicting provisions).

the National Arbitration Forum[34] shall appoint the arbitrator." (Ex. 2, ¶ 4). The Arbitration Agreements, therefore, conflict with each other.[35]

Third, and similar to *Ragab*, the First Arbitration Agreement requires a thirty (30)-day notice period before proceeding to arbitration (Ex. 1, ¶ 3), whereas the Second Arbitration Agreement requires only twenty (20) days (Ex. 2, ¶ 3). Additionally, under the Arbitration Agreements, if a party files an answering statement after the expiration of the notice period, the opposing party selects the arbitrator. (Ex. 1, ¶ 4; Ex. 2, ¶ 4). Thus, the Arbitration Agreements conflict with each other.

Fourth, and similar to *NAACP*, the First Arbitration Agreement provides that "[t]he arbitration shall be held in Rankin County, Mississippi, unless the [b]orrower requests in the demand for arbitration or the answering statement, the arbitration to be held in his, her, or its

---

[34] On July 14, 2009, the Minnesota Attorney General filed a lawsuit against the National Arbitration Forum "(NAF)" for alleged violation of various state consumer protection laws, deceptive trade practices, and false advertising. *See* Complaint, *State of Minnesota v. National Arbitration Forum, Inc., et. al.*, No. 27-CV-09-18550 (Dkt. 1) (D. Minn. July 14, 2009). The Complaint alleged that the NAF, in an attempt to earn revenue, "work[ed] alongside creditors behind the scenes—against the interests of consumers—to convince creditors to place mandatory pre-dispute arbitration clauses in their customer agreements and to appoint the [NAF] as the arbitrator of any disputes that may arise in the future." *Id.* The Complaint further alleged that the NAF "hid[] from the public . . . that [it] is financially affiliated with a New York hedge fund group that owns one of the country's major debt collection enterprises." *Id.* Shortly after the filing of the Complaint, the NAF agreed to "permanently stop administering arbitrations involving consumer debt." Press Release, State of Minnesota Office of the Attorney General, National Arbitration Forum Barred from Credit Card and Consumer Arbitrations under Agreement with Attorney General Swanson (July 19, 2009), http://static.cbslocal.com/station/wc co/news/local/09_0719_agsuesnationalarbitrationforum.pdf. Accordingly, under the Second Arbitration Agreement, it is unclear how an arbitrator would be appointed if the Parties do not agree upon an individual.

[35] The Court acknowledges that this inconsistency could be remedied by the FAA or a statutory gap-filler. See Deaton Truck Line, Inc. v. Local Union 612, Affiliated with the Int'l. Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am., 314 F.2d 418 (5th Cir. 1962) (compelling arbitration when the agreement did not name an arbitrator because the FAA provides a mechanism for the selection of an arbitrator when the parties are unable to agree upon an individual).

county of residence or principal place of business." (Ex. 1, ¶ 5). The Second Arbitration Agreement, however, provides automatically for the arbitration to be held in the borrower's county of residence (Ex. 2, ¶ 5). The Arbitration Agreements, therefore, are inconsistent.

Fifth, and similar to *Ragab* and *NAACP*, the First Arbitration Agreement provides that the "[l]ender shall pay the arbitrator's fees and expenses for the first two days of hearings." (Ex. 1, ¶ 4) Further, the First Arbitration Agreement provides that "[i]n his decision or award, the arbitrator shall direct the parties to pay his or her fees and other costs according to the relative fault of the parties." (*Id.*) Thus, the First Arbitration Agreement is internally inconsistent. While the document requires Tower Loan to pay the arbitrator's fees and expenses for the first two days of hearings, the arbitrator is also required to apportion his fees and costs between the Parties in accordance with their relative fault. In theory, then, the Debtor could be responsible for paying the entirety of the arbitrator's fees and costs. Additionally, the Second Arbitration Agreement provides that "the [c]ompany shall pay all costs of the arbitration," excluding attorneys, experts, and witness fees and expenses (Ex. 2, ¶ 4). The Arbitration Agreements, therefore, conflict with each other. The Court is unable to discern whether Tower Loan pays none, some, or all of the costs under the Arbitration Agreements.[36]

Sixth, and similar to *Ragab* and *NAACP*, the First Arbitration Agreement does not address which party is responsible for paying attorneys, experts, and witness fees and expenses.

---

[36] At the Hearing, Tower Loan asserted that it will pay the fee to initiate arbitration and all costs and fees of the arbitration. Tower Loan cannot, after acknowledging that the Arbitration Agreements contain inconsistencies, arbitrarily choose the provision more favorable to the Debtor in an attempt to force him into arbitration. *See Sullivan v. Protex Weatherproofing, Inc.*, 913 So. 2d 256, 265 (Miss. 2005) (quoting *Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*, 374 F.3d 1, 10 (1st Cir. 2004) ("No one can seriously argue that clauses can be plucked at random from one agreement and inserted into the other."). To form a contract, the material terms must be "sufficiently definite," and the parties must achieve a meeting of the minds with respect to the agreement. *See Union Planters Bank, Nat'l. Ass'n*, 912 So. 2d at 120; *Rotenberry*, 864 So. 2d at 270.

The Second Arbitration Agreement, however, provides that "each party must bear the cost of its own attorneys, experts and witness fees and expenses," unless the arbitrator chooses to award otherwise (Ex. 2, ¶ 4). Thus, the Arbitration Agreements are inconsistent.

Seventh, the First Arbitration Agreement does not require the lender "to initiate arbitration proceedings for collection matters of $10,000 or less or before repossessing collateral or foreclosing upon real property. However, disputes arising out of or relating to foreclosure or repossession of collateral shall be arbitrated." (Ex. 1, ¶ 8). The Second Arbitration Agreement contains no such carve out. The Arbitration Agreements, therefore, are inconsistent and suggest that all material terms are not "sufficiently definite."

While Justice Gorsuch raised many concerns in *Ragab*, the Court can distinguish his dissent from the issues raised in the Adversary. First, the Debtor is not a sophisticated party. The Debtor is a truck driver and mechanic who was not represented by counsel when he signed the Arbitration Agreements (Adv. Dkt. 17). Further, and unlike the plaintiff in *Ragab*, the Debtor did not participate in the negotiation or drafting of the Loan Agreement and the Arbitration Agreements—these documents were created by Tower Loan. Accordingly, the claims in the Adversary arise out of a consumer, rather than a commercial, transaction. Second, and unlike the defendants in *Ragab*, Tower Loan has not acknowledged that the Debtor's claims fall within the scope of the Second Arbitration Agreement. Instead, Tower Loan maintains that the Second Arbitration Agreement governs only claims against insurance companies arising out of insurance policies. Tower Loan desires to proceed exclusively under the First Arbitration Agreement. The Debtor, therefore, "would [not] be free to initiate arbitration under the terms of whichever . . . agreement[] he prefers." *See Ragab*, 841 F.3d at 1139 (Gorsuch, J., dissenting). Additionally, the Arbitration Agreements each contain both favorable and unfavorable

provisions with respect to the Debtor.  For the Debtor to proceed unprejudiced, he would need to "pick and choose" provisions from each agreement to govern the arbitration.  Third, while courts have compelled arbitration where the agreement included only a provision requiring arbitration,[37] the Arbitration Agreements, like those in *Ragab*, contain "multiple, specific, conflicting arbitration provisions, and not one general or vague arbitration clause." *Ragab*, 841 F.3d at 1138.  Although the FAA and other statutory authority provide mechanisms to fill gaps in an otherwise valid agreement, they are unable to reconcile the multiple, specific, inconsistent and conflicting provisions contained in the Arbitration Agreements.  Lastly, because the Adversary involves a consumer transaction, an analogy to the "mirror image" rule, rather than the "battle of the forms" doctrine or "knockout rule" governed by the Uniform Commercial Code, is more applicable.  *See In re Whatever, LLC*, 478 B.R. 700, 709 (Bankr. W.D. Pa. 2012) ("The 'knockout rule' is a statutory exception to the mirror image rule . . . [and] only applies to transactions in goods.").  The mirror image rule, which controls at common law, states that a contract forms where there is an "unconditional acceptance of the offer." *Sutter-Van Horn Co. v. Miss. Home Tel. Co.*, 69 So. 996, 997 (Miss. 1915).  Additionally, "not only must the acceptance be unconditional, but it must be identical with the terms of the offer. It must not vary from the proposal, either by way of omission, addition, or alteration. If it does, neither party is bound." *Id.* (quoting 1 Elliot on Contracts §§ 37, 38; Lawson on Contracts § 25 (2d ed.)).  Thus, consumer transactions are held to a standard of higher specificity and clarity than commercial transactions.

---

[37] *See Guthrie v. Barda*, 533 P.2d 487, 487 (Colo. 1975) (compelling arbitration when the agreement stated only that claims "shall be submitted to binding arbitration").

Turning to Tower Loan's argument at the Hearing, Mississippi recognizes the duty-to-read doctrine.  *See Russell v. Performance Toyota, Inc.*, 826 So. 2d 719, 726 (Miss. 2002) ("In Mississippi, a person is charged with knowing the contents of any document that he executes."); *see also Cont'l Jewelry Co. v. Joseph*, 105 So. 639, 639 (Miss. 1925) ("A person cannot avoid a written contract which he has entered into on the ground that he did not read it or have it read to him, and that he supposed its terms were different, unless he was induced not to read it or have it read to him by fraudulent representations made to him by the other party, on which he was entitled to rely.").  While the Parties did not present to the Court any evidence of fraudulent misrepresentation on behalf of Tower Loan, the Arbitration Agreements contain numerous materially inconsistent and conflicting provisions.  As a result, a prudent purchaser reading the Arbitration Agreements would likely obtain only a generalized sense that arbitration would resolve his or her claims because the Arbitration Agreements "do not plainly convey—with precision and consistency—what the exact terms and conditions of that arbitration process would be."  *NAACP of Camden Cty. E.*, 24 A.3d at 794.  Since Mississippi law requires a contract's material terms to be "sufficiently definite," the Court follows *Ragab* and finds that the conflicting and inconsistent Arbitration Agreements indicate that the Parties did not achieve a meeting of the minds with respect to arbitration—the dispute could be governed by one or three arbitrators; either the court or a dispute resolution company that has since been renamed and no longer services consumer arbitration disputes will choose the arbitrator if the Parties cannot agree on a candidate; the notice period to deliver an answering statement to the other party is either thirty (30) days or twenty (20) days, and there are consequences if the answering statement is not timely filed; the Debtor might be required to request that the arbitration be held in his county of residence; Tower Loan might pay no costs, two days of costs, or all costs of the

arbitration; the Debtor might be responsible for paying all attorneys, experts, and witness fees; and Tower Loan might not be bound to arbitrate claims for collection matters of $10,000 or less, before repossessing collateral or foreclosing upon real property.[38]

**B.   Does the Arbitration Agreement contain a delegation clause requiring the Parties' claims to proceed to arbitration?**

Because the Court finds that no valid agreement to arbitrate exists, it does not need to reach the issue of whether the Arbitration Agreement actually contains a delegation clause requiring the Parties' claims to proceed to arbitration for the arbitrator to decide gateway arbitrability issues.

**Conclusion**

For the above and foregoing reasons, the Court concludes that no actual agreement to arbitrate exists because the Parties did not achieve a meeting of the minds as to how to arbitrate claims under the Arbitration Agreements.   A separate final judgment shall be entered in accordance with Rules 7054 and 9021 of the Federal Rules of Bankruptcy Procedure.

##END OF OPINION##

---

[38] Having reached this conclusion, it is unnecessary for the Court to consider the unconscionability argument raised by the Debtor in the Debtor's Response but largely abandoned at the Hearing.